UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| STEVEN ROGER MANNON, <br><br> Plaintiff, <br><br> v. <br><br> VAMC ANN ARBOR, <br><br> Defendant. | Case No. 23-cv-12612 <br> Honorable Mark A. Goldsmith <br> Magistrate Judge Elizabeth A. Stafford |

**REPORT AND RECOMMENDATION ON PARTIES' CROSS-MOTIONS
FOR SUMMARY JUDGMENT
(ECF NOS. 140, 146)**

## I.    Introduction

Plaintiff Steven Roger Mannon brings this action under the Privacy Act, 5 U.S.C. § 552a(g)(1)(A), seeking review of the government's denial of his request to amend two Department of Veterans Affairs (VA) medical records that allegedly contain inaccuracies.  ECF No. 128.  The Honorable Mark A. Goldsmith referred the case to the undersigned for all pretrial proceedings under 28 U.S.C. § 636(b)(1).  ECF No. 34.  The parties cross-move for summary judgment.  ECF No. 140; ECF No. 146.  The Court **RECOMMENDS** that Mannon's motion be **DENIED** and that the government's motion be **GRANTED**.

## II.      Background

From July 2018 through January 2020, Mannon was treated for chronic musculoskeletal pain by Andrew Egger, M.D., at the VA pain management and rehabilitation clinic.  ECF No. 49-1, PageID.570; ECF No. 103, PageID.1615.  Egger treated Mannon's pain with an opioid regimen of oxycodone, as well as physical therapy and other modalities.  ECF No. 103, PageID.1615.  After Egger left the practice, Devon Shuchman, M.D., assumed Mannon's care and saw him for two appointments in January 2020.  *Id.*; ECF No. 146-2; ECF No. 146-4.  During the first appointment, Shuchman introduced the long-term goal of gradually reducing Mannon's opioid usage and noted that Mannon became "upset and argumentative" about the recommendation.  ECF No. 146-2, PageID.2622-2623.

On February 24, 2020, Mannon sent the pain clinic a message requesting a refill of his oxycodone.  ECF No. 146-7.  Unhappy with the alleged lack of response, Mannon sent an irate message to the pain clinic on March 3.  ECF No. 146-8.  On March 4, Shuchman acknowledged receipt of Mannon's message and entered the following addendum:

> Patient has been aggressive with providers in pain clinic, verbally demanding of specific treatment, specifically oxycodone, and resistant to multidisciplinary treatment program as indicated and recommended.

2

It should be noted that patient was seen on an urgent, overbook basis in January when he reported not having prescription quantity expected, stating that he had been without pain medication for several days at that time, only notifying our clinic and presenting to clinic on the date of that visit.  This was an accom[m]odation made for the patient.  Additionally, he was overbooked for follow up to have more complete E&M visit, [urine drug screen (UDS)], documentation for LTOT reviewed and expectations for treatment discussed.

Overall, patients need to demonstrate participation in treatment plan as discussed with providers.  Prescribing opioid pain medications for Mr. Mannon's chronic pain is not an appropriate monotherapy for his symptom management.  Given the above history and concerns in additional to UDS + for cannabinoids, cancelled/no show for mental health appointments, I will refill oxycodone as noted previously, but with slight reduction in quantity, concordant with directions for PRN use, and for goal of titration from long term opioid therapy (previously written as oxycodone 5mg TID PRN #113, plan for dispensing #90 only).  He has pregabalin prescribed and not noted in UDS GCMS [a urine drug test].[1] This is an ongoing recommendation and will be beneficial for pain as well as any titration of opioid.

*Id.*; ECF No. 146-9.

Mannon appealed the March 4 addendum, which was forwarded to

Lisa DiPonio, M.D., the chief of the pain clinic.  ECF No. 49-1, PageID.632.

DiPonio spoke with Mannon about his concerns on April 2 and wrote a

---

[1] Pregabalin is the generic name for Lyrica.  *See* https://my.clevelandclinic.org/health/drugs/19097-pregabalin-capsules (last visited March 6, 2026).  As the government explains, "GCMS" refers to a gas chromatography mass spectrometry urine drug test that can test for pregabalin.  ECF No. 146, PageID.2604 n.2.

progress note the next day summarizing that call.  *Id.*; ECF No. 146-10, PageID.2641.  She stated:

> [Mannon's] main complaint is his perceived lack of communication with the pain clinic physician, feeling that his plan of care was changed without his agreement, and that he was misunderstood when he tried to communicate his disagreement.  He felt that the reasons he was given for the opioid taper were not valid.  [S]pecifically, he states his previous provider knew he was on marijuana, he had always been compliant with use of opioids and pregabalin, and he feels he has been respectful in his communications.
>
> He feels that his current opioid therapy is important for his overall health.  He states that in the past when he has gone off opioids in the past he ended up with acute health issues as a result.
>
> …
>
> After a long discussion, we agreed on the following points:
>
> 1.  He would like more communication with pain clinic physicians… He feels that "bridges have been burned" with Dr. Shuchman and he consents to and requests future communication with Dr. Dadabayev.
>
> 2.  He understands my own point of view that chronic opioid treatment for chronic noncancer pain is not the standard of care for many reasons, including dependence and opioid-induced hyperalgesia.  There is no diagnostic test to prove opioid-induced hyperalgesia, it is a clinical diagnosis.  While I do not make claims for or against his compliance with the prescriptions as previously written, it remains that chronic opioid treatment for noncancer pain is not standard of care, and absence of opioid treatment in itself does not cause health problems or heart disease.

ECF No. 146-10.

4

Mannon asked the VA to amend the March 4 addendum, denying that he was aggressive, noncompliant, failed to disclose marijuana use, or missed appointments.  ECF No. 146-11.  The VA denied his request in January 2021, and the VA Office of General Counsel issued a final decision denying the request in March 2023.  ECF No. 146-12; ECF No. 146-13.  Mannon also requested amendment of DiPonio's April 3 progress note, claiming that her summary was "incomplete[,] irrelevant, and inaccurate."  ECF No. 146-14.  The VA denied the request in March 2022, and the VA Office of General Counsel issued a final decision denying the request in June 2025.  ECF No. 146-15; ECF No. 146-16.

Mannon brings claims under 5 U.S.C. § 552a(g)(1)(A), alleging that the March 4 and April 3 records are inaccurate.  ECF No. 128.  He alleges that the March 4 addendum falsely documents disruptive behavior, noncompliance with treatment, and failure to disclose marijuana use.  *Id.*, PageID.2146.  Mannon also alleges that the April 3 progress note "inaccurately characterizes [him] as demanding specific treatment, resistant to multidisciplinary treatment, and noncompliant."  *Id.*  And he claims that the progress note omits Shuchman's communication failures and other disputed details.  *Id.*

5

### III.     Analysis

### A.

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must specify the portions of the record that show the absence of a genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant satisfies this burden, the burden shifts to the non-moving party to go beyond the pleadings and set forth specific facts showing a genuine issue for trial.  *Id.* at 324.  The Court must view the factual evidence in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The opposing party "may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an

affirmative showing with proper evidence in order to defeat the motion."

*Alexander v. Caresource*, 576 F.3d 551, 558 (6th Cir. 2009) (cleaned up).

"[T]he failure to present any evidence to counter a well-supported motion

for summary judgment alone is grounds for granting the motion."  *Id.*

(cleaned up).  "Conclusory statements unadorned with supporting facts are

insufficient to establish a factual dispute that will defeat summary

judgment."  *Id.* at 560.

**B.**

The Court first addresses an evidentiary issue.  Mannon's motion for

summary judgment relies on alleged transcripts of telephone calls he had

with DiPonio; Alisher Dadabayev, M.D., another pain clinic physician; and

Livia Franchina, a pain clinic pharmacist.  ECF No. 140, PageID.2521-

2522, 2524, 2528, 2541-2542 (citing ECF No. 103, PageID.1504-1515,

1516-1531, 1532-1547).  These transcripts have not been authenticated.

"The Court cannot consider evidence at summary judgment that a

jury could not consider at trial," including evidence that cannot be properly

authenticated.  *Thomas v. Abercrombie & Fitch Co.*, 301 F. Supp. 3d 749,

754 (E.D. Mich. 2018).  At a minimum, a party must show at the summary

judgment stage that he "*can* make good on the promise of the pleadings by

laying out enough evidence that *will* be admissible at trial to demonstrate

7

that a genuine issue on a material fact exists." *Alexander*, 576 F.3d at 558.

The authentication requirement compels a proponent to "produce evidence

sufficient to support a finding that the item is what the proponent claims it

is." Fed. R. Evid. 901(a). But Rule 901 is not "a particularly high hurdle,"

*United States v. Hall*, 20 F.4th 1085, 1104 (6th Cir. 2022), and requires

only that the proponent introduce sufficient proof "so that a reasonable juror

could find in favor of authenticity or identification," *United States v. Farrad*,

895 F.3d 859, 876 (6th Cir. 2018).

The authentication requirement applies to audio recordings and

written transcripts. A recording is authenticated if a court is satisfied that

the "recording accurately reflects the conversation in question," and a

proper foundation is laid through a chain of custody or other testimony

showing "the accuracy and trustworthiness of the evidence." *United States*

*v. Miller*, 817 F. App'x 119, 124 (6th Cir. 2020). A transcript is

authenticated if the proponent shows its accuracy, "which entails either

testimony by the scrivener that the transcript was carefully prepared and

checked or testimony by a person who heard the conversation to the effect

that the transcript faithfully reflects what was said." Christopher B. Mueller

& Laird C. Kirkpatrick, 5 Federal Evidence, § 9:14 (4th ed. 2021); *see*

*United States v. West*, 948 F.2d 1042, 1044 (6th Cir. 1991) ("When the

parties dispute the accuracy of the transcripts, the transcriber should attest to the accuracy of the transcripts.").

Mannon offers little information about the transcripts.  It appears that he recorded the calls with DiPonio, Dadabayev, and Franchina and had the recordings transcribed by GoTranscript.  ECF No. 140, PageID.2521, 2525 (noting that the transcripts are "certified by GoTranscript" and that Mannon provided the VA with the audio recording of his call with DiPonio).  GoTranscript offers various services, including human transcription and artificial intelligence transcription.[2]  It is unclear how Mannon recorded the calls or what kind of service Mannon used to transcribe the calls.  The transcripts were also modified to redact references to names (*e.g.*, "Dr. Pain Clinic Doctor (2)" and "Dr. Pain Clinic Service Chief").  *See, e.g.*, ECF No. 103, PageID.1511, 1515, 1518.  It is unclear whether Mannon made those modifications or whether they were part of the original transcript.

The transcripts are inadmissible as submitted, as Mannon offers no information about their accuracy or the accuracy of the underlying recordings.  *See Latimore v. Trotman*, No. 14-13378, 2021 WL 5763009, at *5 (D. Mass. Dec. 3, 2021) (striking handwritten transcripts prepared by a pro se plaintiff who failed to "explain his qualifications to transcribe the

---

[2] *See* https://gotranscript.com/ (last visited March 5, 2026).

interviews and the preparation of the transcript to ensure its accuracy");
*Satawa v. Bd. of Cnty. Rd. Comm'rs of Macomb Cnty.*, 788 F. Supp. 2d 579, 590, n.7 (E.D. Mich. 2011), *rev'd on other grounds*, 689 F.3d 506 (6th Cir. 2012) (transcripts were unauthenticated because there was no certification of the authenticity of the underlying audio recordings).

Even so, since the government raises no specific objections to the transcripts' accuracy, the Court assumes that Mannon could cure the authentication defects at trial. *See Alexander*, 576 F.3d at 558. But Mannon should not prevail on summary judgment even if the transcripts are considered.

## C.

The Privacy Act regulates "the collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (cleaned up). The act requires agencies to "maintain all records…with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual." 5 U.S.C. § 552a(e)(5). An individual may "request amendment of a record pertaining to him," and the agency must either make the correction or explain its refusal to amend the record. *Id.* § 552a(d)(2).

10

Subsection (g)(1) of the Privacy Act "recognizes a civil action for agency misconduct fitting within any of four categories." *Chao*, 540 U.S. at 618. The first subsection, § 552a(g)(1)(A), "authorizes suit when a government agency refuses to amend an individual's record in accordance with his request."[3] *Haase v. Sessions*, 893 F.2d 370, 373 (D.C. Cir. 1990) (cleaned up). If a plaintiff prevails on a claim under § 552a(g)(1)(A), the court may award equitable relief by "order[ing] the agency to amend the individual's record in accordance with his request or in such other way as the court may direct." 5 U.S.C. § 552a(g)(2)(A).

A court reviewing a claim under § 552a(g)(1)(A) is not to evaluate "the agency's review of the amendment request," but must determine de novo whether the request should have been granted. *White v. Off. of Pers.*

---

[3] Mannon's motion erroneously discusses § 552a(g)(1)(C). ECF No. 140, PageID.2529. That subsection permits suit for "an agency's failure to maintain an adequate record on an individual, when the result is a determination 'adverse' to that person." *Chao*, 540 U.S. at 618. Mannon argues that he suffered several adverse actions because of the allegedly inaccurate records at issue. ECF No. 140, PageID.2517-2520, 2531-2532. But the operative complaint advances only amendment claims under § 552a(g)(1)(A), not "adverse effect" damage claims under § 552a(g)(1)(C). *See* ECF No. 128; *Bassiouni v. Fed. Bureau of Investigation*, No. 02 C 8918, 2003 WL 22227189, at *3 n.2 (N.D. Ill. Sept. 26, 2003) (noting the distinction between the claims). And Mannon may not raise a new claim in his summary judgment briefing. *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). The alleged adverse actions are thus irrelevant.

11

*Mgmt.*, 787 F.2d 660, 663 (D.C. Cir. 1986).  The court may consider any evidence presented and is not confined to the administrative record.  *Doe v. United States*, 821 F.2d 694, 697-98 (D.C. Cir. 1987).  "The burden is on the individual to establish the inaccuracy of a challenged record."  *Kursar v. Transp. Sec. Admin.*, 751 F. Supp. 2d 154, 170 (D.D.C. 2010) (cleaned up).

"[T]he Privacy Act allows for correction of facts but not correction of opinions or judgments."  *Mueller v. Winter*, 485 F.3d 1191, 1197 (D.C. Cir. 2007) (cleaned up).  Whether a challenged statement is a fact or a judgment depends on whether it is "capable of verification."  *McCready v. Nicholson*, 465 F.3d 1, 19 (D.C. Cir. 2006).  "If a subjective judgment is 'based on a demonstrably false' factual premise, however, the Privacy Act compels the agency to correct or remove the judgment from the complaining individual's record."  *Mueller*, 485 F.3d at 1197 (quoting *White*, 787 F.2d at 662).  But if a subjective evaluation is based on different factors or "there are various ways of characterizing some of the underlying events," the record should not be amended.  *White*, 787 F.2d at 662.  A performance evaluation is a classic example of a subjective judgment.  *Mueller*, 485 F.3d at 1197.  But if the evaluation was based on false

12

information, the agency should not be permitted to retain it.  *White*, 787 F.2d at 662.

### D.

Mannon maintains that the March 4 addendum was inaccurate, arguing that he (1) was not aggressive or demanding, (2) complied with taking his pregabalin, and (3) disclosed his marijuana use to providers and did not miss mental health appointments.  ECF No. 140, PageID.2509-2511.  The Court confronts each of these issues in turn.

### 1.

The March 4 addendum described Mannon as "aggressive with providers in [the] pain clinic, [and] verbally demanding of specific treatment, specifically oxycodone."  ECF No. 146-9, PageID.2639.  This statement is a subjective judgment that may not be amended under the Privacy Act.  *See Mueller*, 485 F.3d at 1197.  For example, a physician's assessment of a patient as "paranoid and delusional" and other officials' statements about the patient's behavior recorded in incident reports were held to be opinions that could not be corrected.  *Reinbold v. Evers*, 187 F.3d 348, 361 (4th Cir. 1999).  Shuchman's subjective impression of Mannon as aggressive and demanding likewise reflects her opinion or judgment.

13

Even if the characterization of Mannon as aggressive and demanding were considered a factual statement, it is supported by the notes from his two January 2020 office visits and his communication with the pain clinic. During Mannon's first visit on January 9, 2020, Shuchman noted that he was "aggressive at times" and became "upset and argumentative" when she discussed gradually reducing his oxycodone.  ECF No. 146-2, PageID.2622.  He "interrupt[ed] with [a] threat to leave the appointment and report [Shuchman] to the patient advocate's office demanding a new physician" when she explained the risks of long-term opioid therapy.  *Id.*, PageID.2623.  Shuchman reassured Mannon that his oxycodone would not be abruptly discontinued and prescribed him enough pills at his regular dosage to last until his next office visit.  *Id.*  The next day, Mannon submitted a written complaint to the pain clinic about Shuchman's "unethical conduct."  ECF No. 146-3.  He objected to her plan to exclude opiates from his treatment regimen, writing:

> Dr. Devon Shuchman's hostility, bias and pharmacophobia do not instill the trust required for an effective doctor/patient relationship.  I am disgusted by being bullied or having my well being threatened.  You have an unethical Doctor who is going to get someone injured because of the blinders her bigoted views result in, please get this corrected.

*Id.*

14

Mannon next saw Shuchman on January 28, 2020.  During that visit, Shuchman again observed that Mannon was "aggressive at times."  ECF No. 146-4, PageID.2628.  She refilled his oxycodone prescription at his regular dosage and referred him to the pain pharmacy for continued monitoring and prescribing of opiates.  *Id.*, PageID.2629.  The same day, Shuchman shared with Mannon's primary care provider her concerns that he had not been participating in any whole health measures, had been gaining weight, and "was not pleased with today's visit" at the pain clinic.  ECF No. 146-5, PageID.2634.

Mannon sent another complaint to the pain clinic about his January 28 visit and Shuchman's "[c]ontinuing unethical conduct."  ECF No. 146-6.  Although Mannon stated that the January 28 visit "was an improvement over [his] first visit," he objected to having to complete a urine drug screen before he left that appointment, as the long wait time to do so conflicted with his schedule.  *Id.*

Mannon sent the pain clinic a message requesting a refill of his oxycodone on February 24, 2020.  ECF No. 146-7.  Because of the alleged lack of response, Mannon sent the pain clinic another message on March 3:

> You have a clerk call me to schedule an appointment a
> month away to explain why you cancelled my treatment with no

> warning or explanation?  You couldn't spare a doctor or nurse to explain or at least acknowledge that I am trying to get some information?  You cowards.

ECF No. 146-8.  Shuchman entered the March 4 addendum just after viewing that message.  *Id.*; ECF No. 146-9.

These records support Shuchman's characterization of Mannon as argumentative and hostile to Shuchman's medical advice to reduce his oxycodone usage.  He made threats and accused Shuchman of being unethical, a bully, biased, and bigoted, insisting that Shuchman's supervisor become involved.  *See* ECF No. 146-3; ECF No. 146-6.  And when the pain clinic allegedly did not respond to his refill request, Mannon responded with an angry tirade.  *See* ECF No. 146-8.  Although this behavior may understandably stem from the difficulties and frustrations of chronic pain, Shuchman's subjective evaluation of Mannon's communications has support in the evidence, so the record should not be amended.  *See White*, 787 F.2d at 662.

Mannon denies that he was aggressive, arguing that he "had no interactions with VA pain clinic clinicians between January 28, 2020 and March 4, 2020."  ECF No. 140, PageID.2509, 2530.  As described, the March 4 addendum was based on Shuchman's interactions with Mannon at his appointments and on his messages to the pain clinic.  Mannon

16

contends that he contacted a VA patient advocate on March 3, 2020, but was polite and followed protocol even though the VA failed to respond to his refill request for nine days.  *Id.*, PageID.2512.  The only "evidence" Mannon cites in support of his account is his motion for preliminary injunction.  *Id.* (citing ECF No. 62-1, PageID.779-781).  But "[a]rguments in parties' briefs are not evidence."  *Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006).  And Mannon's preliminary injunction motion cites no evidence showing that he spoke with a patient advocate.  *See* ECF No. 62-1, PageID.779-780.

Mannon argues that internal VA communications show that staff agreed that he had not behaved aggressively.  ECF No. 140, PageID.2527-2528.  He claims that the March 4 addendum was left in place because VA officials believed that retracting or amending the addendum would undermine Shuchman's authority.  *Id.*  In support, Mannon cites only "VHA Directive 1605.01," but provides no hint where this document is located in the record.  *Id.*  The Court is not obligated to scour the record on Mannon's behalf to develop his arguments.  *See Sutherland v. Warren*, No. 18-cv-13568, 2019 WL 13368706, at *2 (E.D. Mich. Dec. 6, 2019), *adopted*, 2020 WL 13789265 (E.D. Mich. Feb. 10, 2020) (declining to review hundreds of pages of documents that were in the record but were not attached to the

relevant motion).  As the Court has warned Mannon, "[j]udges are not like pigs, hunting for truffles that might be buried in the record."  ECF No. 84, PageID.957 (quoting *Knight Cap. Partners Corp. v. Henkel AG & Co., KGaA*, 930 F.3d 775, 780 n.1 (6th Cir. 2019)).

Mannon also cites Exhibit G, which he describes as an email chain between DiPonio and Dadabayev.  ECF No. 140, PageID.2528, 2541 (citing ECF No. 103, PageID.1520-1528).  The pages that correspond with Mannon's citation for Exhibit G include a transcript of a telephone call between Mannon and Dadabayev, not an email chain.  ECF No. 103, PageID.1520-1528.  And the transcript does not support Mannon's claim that Dadabayev agreed that Mannon had not behaved disruptively.  At most, Dadabayev acknowledged Mannon's concerns about inaccuracies and stated, "As a patient, you don't want some inaccurate records to be there, according to you.  I totally agree with you."  *Id.*, PageID.1530. Dadabayev mostly emphasized that Shuchman was not willing to continue a regimen involving Mannon taking three doses of oxycodone daily, and Dadabayev suggested that Mannon find another provider who would be willing to prescribe the medication.  *Id.*, PageID.1520-1528.  Dadabayev did not confirm that Mannon's records contained inaccuracies, but instead

18

reiterated that he "was not involved in that" and that he was speaking as a neutral mediator. *Id.*, PageID.1519, 1521, 1524, 1526.

Mannon next cites a transcript of a call with Franchina. ECF No. 140, PageID.2528 (citing ECF No. 103, PageID.1532-1534). During the call, Franchina stated, "[O]verall, the feeling was that things should have been done differently. We can't go back and change what already occurred." ECF No. 103, PageID.1533. This statement does not acknowledge any inaccurate records or deficiencies in Shuchman's care, as Franchina did not detail what exactly should have been done differently. Franchina also concluded her remark by stating, "The medical community as a whole feels that the use of opioids in chronic pain is not optimal." *Id.*, PageID.1533. Franchina made no comment that Mannon did not behave aggressively.

Mannon also cites a statement from Egger that the March 4 addendum was "inconsistent with my direct observations over the preceding 18 months. At no time did I witness aggression, verbal abuse, or medication seeking behavior." ECF No. 140, PageID.2509, 2530 (citing ECF No. 103, PageID.1615-1616). But Egger's statement describes his own experience with Mannon, admittedly based on a treatment plan incorporating long-term oxycodone use. ECF No. 103, PageID.1615-1616. Egger's statement does not undermine Shuchman's remarks that Mannon

19

was aggressive and verbally demanding when she recommended reducing his oxycodone.

Mannon then contends that Shuchman falsely described him as aggressive in retaliation for his March 3, 2020, complaint about the VA to congressional representative Bob Latta.  ECF No. 140, PageID.2512-2513.  He also claims that another VA official, Steven Neff, admitted that Shuchman "dropped the ball" on Mannon's prescription.  *Id.*  In support, Mannon cites only his motion for preliminary injunction, which is not evidence.  *Id.*, PageID.2513 (citing ECF No. 62-1, PageID.779-781); *see Duha*, 448 F.3d at 879.  And although that motion cites a May 12, 2020, letter from a VA director to Latta, Mannon offers no evidence that Shuchman knew of Mannon's complaint to Latta when she entered the March 4 addendum.  ECF No. 62-1, PageID.779-780 (citing ECF No. 49-1, PageID.631).

Mannon also cites Exhibit G, the transcript of a telephone call between Mannon and Dadabayev, as evidence of Neff's alleged statement.  ECF No. 140, PageID.2513, 2541 (citing ECF No. 103, PageID.1520-1528).  The transcript does not reference Neff.  ECF No. 103, PageID.1520-1528.

In any event, Mannon's arguments that Shuchman had a retaliatory motive or "dropped the ball" are irrelevant.  As described above, the only relevant inquiry under § 552a(g)(1)(A) is whether the challenged record is inaccurate.  *Kursar*, 751 F. Supp. 2d at 170.  The government's evidence shows that Shuchman's subjective judgment of Mannon's communications was not "'based on a demonstrably false' factual premise," defeating Mannon's claim that the records should be amended to reflect his own subjective judgment of the relevant events.  *See Mueller*, 485 F.3d at 1197 (quoting *White*, 787 F.2d at 662).

**2.**

Mannon next disputes a statement in the March 4 addendum that Mannon "has pregabalin [Lyrica] prescribed and not noted in" the urine drug screen.  ECF No. 146-9, PageID.2640.  The January 28, 2020, drug screen results were positive for cannabinoids, oxycodone, chlorpheniramine, nicotine, and caffeine, with no pregabalin detected.  ECF No. 146-17.  Mannon contends that the January 28 drug screen did not test for pregabalin.  ECF No. 140, PageID.2510, 2530.

Mannon's motion cites VA laboratory reports in Exhibit D, but he does not specify where those reports can be found in the record.  *See id.*, PageID.2510, 2530, 2541.  As stated above, the Court need not scour the

21

record to develop Mannon's arguments.  *See Knight Cap.*, 930 F.3d at 780 n.1; *Sutherland*, 2019 WL 13368706, at \*2.

The motion also cites Egger's statement that he reviewed the January 28 drug screen and found that it showed "therapeutic ranges for prescribed medications and no illicit substances."  ECF No. 103, PageID.1616.  But Egger did not specify that the January 28 drug screen showed therapeutic levels of pregabalin; rather, he referred generically to "prescribed medications."  *Id.*  And the record undeniably shows that, though Mannon was prescribed Lyrica, the January 28 drug test failed to show the presence of pregabalin.  *See* ECF No. 146-2, PageID.2622; ECF No. 146-17, PageID.2663.

Mannon included a new record as an exhibit to his reply that explains why the drug screen did not detect pregabalin.  An April 2020 administrative note documented a call between Mannon and a VA staff member about the January 28 drug screen.  ECF No. 154-3, PageID.3354. The VA staff member spoke with the lab, which "confirmed that the specific specimen in question was not tested for pregabalin metabolites."  *Id.* Shuchman then reviewed the drug screen order and confirmed that she ordered that pregabalin levels be included in the test.  *Id.*  Put simply, the lab messed up.

Courts typically decline to consider evidence raised for the first time in a reply.  *See, e.g.*, *GS Holistic , LLC v. Abro Adrian, LLC*, No. 1:23-cv-1270, 2025 WL 3725660, at *1 n.1 (W.D. Mich. Sept. 18, 2025) (declining to consider a sworn declaration first submitted with a reply); *Int'l-Matex Tank Terminals-Ill. v. Chemical Bank*, No. 1:08-cv-1200, 2009 WL 1651291, at *2 (W.D. Mich. June 11, 2009) ("The remedy for dealing with new evidence first appearing in a reply is that we will not consider issues or evidence raised for the first time in a reply." (cleaned up)); *see also Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (issues raised for the first time in a reply brief are waived).  Because the opposing party has no opportunity to respond to new evidence raised in a reply, courts deem those issues waived "[a]s a matter of litigation fairness and procedure."  *Scottsdale Ins.*, 513 F.3d at 553.  Thus, the April 2020 administrative note about the lab results should not be considered.

Besides, if anything, the April 2020 record undermines Mannon's complaint that the VA failed to correct his medical record to show that the January 28 drug screen did not test for pregabalin.  Under the Privacy Act, "the term 'record' means any item, collection, or grouping of information about an individual that is maintained by an agency," including "medical history."  5 U.S.C. § 552a(a)(5).  The VA's record of Mannon's medical

23

history clarifies that the January 28 lab results showed no pregabalin because his urine was not tested for that drug.  ECF No. 154-3, PageID.3354.  The record has already been corrected.

**3.**

The March 4 addendum also stated, "Given the above history and concerns in additional [sic] to UDS + for cannabinoids, cancelled/no show for mental health appointments, I will refill oxycodone as noted previously, but with slight reduction in quantity…and for goal of titration from long term opioid therapy."  ECF No. 146-9, PageID.2640.

Mannon first challenges the statement that he tested positive for marijuana.  He denies that he "failed to disclose marijuana use," citing Egger's statement that he "disclosed Medical cannabinoid use appropriately."  ECF No. 140, PageID.2510, 2530 (citing ECF No. 103, PageID.1615).  Mannon mischaracterizes the March 4 addendum.  It did not state that he failed to disclose his marijuana use.  Rather, it correctly noted that the January 28 drug screen was positive for marijuana, which Mannon admits "was an expected result."  *Id.*, PageID.2511; ECF No. 146-9, PageID.2640; ECF No. 146-17.  Shuchman's observation that Mannon tested positive for marijuana is thus accurate.

24

Mannon also disputes the statement that he did not attend scheduled mental health appointments.  ECF No. 140, PageID.2511, 2530.  This statement is supported.  A clinical social worker noted that Mannon was a "psychiatry no-show" on March 3, 2020, and explained, "Veteran did not call to cancel and did not attend scheduled depression group appointment." ECF No. 146-18, PageID.2666.  The provider called Mannon, who explained that he was confused about his start date after he had checked in and tried to attend his appointment on February 25.[4]  *Id.*  The provider told him to attend the group session the next week and that he could attend two make-up sessions.  *Id.*

Mannon contends that he "attended psychology and psychiatry appointments as required."  ECF No. 140, PageID.2511.  He again cites Egger's statements that he "attended psychology and psychiatry appointments when scheduled" and "was compliant with [the] treatment plan," and that the addendum "mischaracterizes his behavior and medical adherence."  ECF No. 103, PageID.1615-1616.  Egger's views about Mannon's compliance were based on his personal knowledge of treating

---

[4] Another record reflected that Mannon was a no-show for a depression group appointment on February 25, 2020, but the government agreed to delete that note under the Privacy Act in January 2021.  ECF No. 49-1, PageID.688.  The Court thus does not consider that record as evidence that Mannon missed a mental health appointment on February 25.

Mannon from July 2018 through early January 2020. *Id.*  His statements do not undermine Shuchman's observation that Mannon missed mental health appointments after she assumed his care in January 2020.  And though the Court does not doubt that Mannon missed the March 3 appointment because of simple confusion about his start date, Shuchman's statement that he missed appointments was factually accurate.

Mannon may disagree with Shuchman's reliance in the addendum on the positive drug test and failure to attend mental health appointments as reasons to reduce his opioid usage.  But Shuchman's reasoning and decision for reducing opioid therapy amounts to medical judgment that cannot be amended under the Privacy Act.  *See Phillips v. Widnall*, 110 F.3d 74 (Table) (10th Cir. 1997) (affirming rejection of claim to amend physician's medical conclusion that the plaintiff was likely dependent on prescription medication); *Hardy v. Wilkie*, No. 20-0132, 2022 WL 1612067, at *4 (W.D. La. May 20, 2022) (rejecting Privacy Act claim seeking to amend physicians' inclusion of her gender reassignment surgery in her medical history, their phrasing of that history, and their "opinions and judgments regarding her surgery").

26

**E.**

The Court next evaluates DiPonio's April 3 progress note, which summarized her telephone call with Mannon.  ECF No. 146-10, PageID.2641.  Mannon contends that the progress note: (1) omitted his "side of the story," including his objections to reducing oxycodone and his arguments that he was neither disruptive nor noncompliant with taking pregabalin; (2) reiterated Shuchman's inaccurate reports of aggressive behavior and noncompliance; and (3) omitted certain admissions by VA staff.  ECF No. 140, PageID.2521-2524.

As quoted above, the April 3 progress note, entitled "Pain Medicine Telephone Encounter Note," states:

> [Mannon's] main complaint is his perceived lack of communication with the pain clinic physician, feeling that his plan of care was changed without his agreement, and that he was misunderstood when he tried to communicate his disagreement.  He felt that the reasons he was given for the opioid taper were not valid.  [S]pecifically, he states his previous provider knew he was on marijuana, he had always been compliant with use of opioids and pregabalin, and he feels he has been respectful in his communications.
>
> He feels that his current opioid therapy is important for his overall health.  He states that in the past when he has gone off opioids in the past he ended up with acute health issues as a result.

ECF No. 146-10.  Far from omitting Mannon's concerns, DiPonio expressly acknowledged his disagreement with reducing opioid therapy because he

experienced health setbacks when he tried to discontinue the medication in the past.  DiPonio also noted Mannon's position that he complied with treatment—including pregabalin—and was respectful in his communications with VA staff.

Mannon protests that the April 3 progress note did not state that the pregabalin test was never run or that he disputed the accuracy of the March 4 addendum.  ECF No. 140, PageID.2524.  But DiPonio accurately noted Mannon's disputes.  That she did not draft the progress note using Mannon's preferred language or level of detail is a matter of discretion or judgment that cannot be amended under the Privacy Act.  *See Reinbold*, 187 F.3d at 361 (declining to order amendment of officials' incident reports and observations about the plaintiff's behavior, even though their opinions "may be subject to debate"); *Hardy*, 2022 WL 1612067, at *4 (holding that the plaintiff's objections to how her physicians phrased her surgical history in her medical records constituted judgments that were "not subject to alteration under the Privacy Act").

Mannon insists that DiPonio "sidestepped [his] core grievance" and instead "defended" the pain clinic's plan of reducing his opioid usage.  ECF No. 140, PageID.2523.  DiPonio included in the April 3 progress note her "own point of view that chronic opioid treatment for chronic noncancer pain

28

is not the standard of care for many reasons."  ECF No. 146-10.  Again,

this statement represents DiPonio's medical opinion that, while subject to

debate, cannot be amended under the Privacy Act.  *See Reinbold*, 187

F.3d at 361; *Phillips*, 110 F.3d 74 (Table).

Mannon next argues that DiPonio reiterated Shuchman's inaccurate

reports of aggressive behavior and noncompliance.  ECF No. 140,

PageID.2522-2523.  The April 3 progress note does not state that Mannon

was aggressive or noncompliant.  Instead, DiPonio wrote only, "*While I do*

*not make claims for or against [Mannon's] compliance with the*

*prescriptions as previously written*, it remains that chronic opioid treatment

for noncancer pain is not standard of care."  ECF No. 146-10 (emphasis

added).  Thus, DiPonio remained neutral regarding Mannon's behavior and

compliance but supported reducing opioid therapy based on her medical

judgment.

Last, Mannon contends that the April 3 progress note omits certain

admissions made by Dadabayev and Franchina.  ECF No. 140,

PageID.2521-2522, 2524 (citing ECF No. 103, PageID.1504-1515, 1516-

1531, 1532-1547).  Relying on statements from the telephone call

transcripts, Mannon contends that he participated in a conference call on

April 2, 2020, with DiPonio, Dadabayev, Franchina, and others.  *Id.*,

PageID.2521.  That is inaccurate.  The transcripts document three separate calls: (1) an April 2 call between Mannon and Diponio; (2) an April 3 call between Mannon and Dadabayev; and (3) a May 1 call between Mannon and Franchina.  ECF No. 103, PageID.1504-1515, 1516-1531, 1532-1547.  Mannon does not explain why DiPonio should have included statements from Mannon's *later* conversations with Dadabayev or Franchina in a progress note summarizing her own call with him on April 2.  *See id.*  Nor does Mannon identify any inconsistencies between the transcript of his call with DiPonio and the April 3 progress note.  DiPonio's failure to include Dadabayev's and Franchina's statements does not render the April 3 progress note inaccurate.

**F.**

Mannon contends that the government failed to mark the March 4 addendum or the April 3 progress note "disputed" after denying his requests to amend the records, citing 5 U.S.C. § 552a(d)(4) and 38 C.F.R. § 1.579(d).  ECF No. 140, PageID.2526-2527, 2534-2535.

Under 5 U.S.C. § 552a(d)(3) and the VA's implementing regulation, 38 C.F.R. § 1.579(c), an individual requesting amendment of a record may appeal an initial refusal, and the agency must make a final determination.  If the appeal is denied, the individual must be permitted "to file with the

agency a concise statement setting forth the reasons for his disagreement with the refusal of the agency." 5 U.S.C. § 552a(d)(3); *see* 38 C.F.R. § 1.579(c). If the individual files a statement of disagreement, any subsequent agency disclosure of the record must "clearly note" any portion of the record containing disputed information. 5 U.S.C. § 552a(d)(4); 38 C.F.R. § 1.579(d).

But Mannon did not allege violations of § 552a(d)(4) or § 1.579(d) in the complaint. ECF No. 128. The Court may not grant relief on this unpleaded claim. *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). Nor has Mannon offered evidence showing that he filed a statement of disagreement after receiving the VA's final decision on his requests to amend the records. Submission of such a statement is a necessary predicate triggering the VA's obligation to mark records as disputed. *See* 5 U.S.C. § 552a(d)(4); 38 C.F.R. § 1.579(d).

## G.

The Court lastly addresses its struggle to decipher the fragmented statements Mannon provided in his combined brief in reply to his motion for summary judgment and in response to the VA's motion. ECF No. 151. For example, Mannon writes:

> Plaintiff de-escalated amid injury; same-day appt due to urgent requests, out meds, acute epididymitis. Jan 10 message to

31

Chief (Ex. H).  "No-show" (Def.'s Ex. 17, PageID.2613) refuted by March 3 note (Ex. E): Checked in; VA error – no noncompliance.  Labs/marijuana: Jan 9 note (Def.'s Ex. 1, PageID.2611) notes October labs positive, no "non-disclosure" until post-Latta/reporting triggered March 4 note – ignores disclosure (Dr. Egger, Ex. 1).  Note omits comms problems reported to advocates (Ex. K); misstates meds (no second 30; ignores individualized plan of 119 max/month to protect from misstatements/sensitivities leading to lose of care).  Hyperalgesia diagnosis in "brief"/"extensive" conversation; promises no abrupt tapers (Def.'s Ex. 1, PageID.2611).

*Id.*, PageID.3219-3220.

When the Court could construe Mannon's arguments, it could not locate evidence to support them without combing through the 176 pages of unlabeled Exhibits E through BB.  *See* ECF No. 151-2 through ECF No. 154-14.  Again, judges have no duty to hunt for Mannon's evidence in the record.  *Knight Cap. Partners Corp.*, 930 F.3d at 780 n.1.

Nor will the Court take the assertions in Mannon's reply "and mold them into a plausible legal argument," as that "is beyond the purview of the courts' judicial role and can result in the subversion of the court's neutrality."  *In re McFadden*, 477 B.R. 686, 690 (Bankr. N.D. Ohio 2012); *see also Pliler v. Ford*, 542 U.S. 225, 226 (2004) ("Requiring district courts to advise pro se litigants…would undermine district judges' role as impartial decisionmakers.").  The Court thus declines to consider Mannon's reply.

32

## IV.    Conclusion

The Court thus **RECOMMENDS** that Mannon's motion for summary judgment be **DENIED** (ECF No. 140) and that the government's motion for summary judgment be **GRANTED** (ECF No. 146).

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD

Date: March 27, 2026March 27, 2026                    United States Magistrate Judge

## NOTICE TO THE PARTIES ABOUT OBJECTIONS

Within 14 days of being served with this report and recommendation, any party may serve and file specific written objections to this Court's findings and recommendations.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  If a party fails to timely file specific objections, any further appeal is waived.  *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*.*  And only the specific objections to this report and recommendation are preserved for appeal; all other objections are waived.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this report and recommendation to which it pertains.  Within 14 days after service of objections, **any non-objecting party must file a response** to the

33

objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections lack merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that this document was served on counsel of record and any unrepresented parties via the Court's ECF System to their email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 27, 2026March 27, 2026.

s/Caitlin Shrum
CAITLIN SHRUM
Case Manager